# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

WENDY COBB,                                    )
                                               )
                Petitioner,          )
                                               )
v.                                             )       Case No. 14-CV-335-GKF-FHM
                                               )
RICKY MOHAN, Warden,                           )
                                               )
                Respondent.          )

## OPINION AND ORDER

Before the court is the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus [Dkt. #8] of petitioner Wendy Cobb. In October 2011, Ms. Cobb was convicted of first degree murder in Oklahoma state court and sentenced to life imprisonment without the possibility of parole. She challenged her conviction on direct appeal, alleging several evidentiary and procedural errors. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed her conviction and sentence. Ms. Cobb in turn filed a petition for a writ of habeas corpus, followed by an amended petition in which she raises six grounds of error. For the reasons set forth in this Opinion and Order, Ms. Cobb's amended petition is denied.

## I.    BACKGROUND

This case arises from the death of petitioner's husband, Michael Cobb.[1] On April 28, 2009, the Osage Fire Department responded to a fire at the Cobbs' home. Firefighters arrived at the scene approximately ten minutes after receiving the dispatch. The home was completely engulfed in flames. Because the home burnt so quickly, Osage Fire Chief Richard Howard suspected arson. He contacted the state fire marshal and directed his team to use a "fog nozzle"

---

[1] Because the petitioner and the victim share the same last name, the court will refer to the petitioner as Ms. Cobb and the victim as Michael. Other family members will likewise be referred to by their first names.

to contain the fire without further disturbing the scene.  After the fire was contained, firefighters entered the home.  They found Michael's remains in the debris.  The medical examiner later determined that Michael had died from blunt force trauma to the head and ruled his death a homicide.

At the time of Michael's death, he and Ms. Cobb were having marital problems.  Michael had filed for divorce and the couple had separated in October 2008.  The divorce was acrimonious.  During this time, Ms. Cobb was involved in a romantic relationship with Nicholas Shires.  They lived together for approximately one month in late 2008 and early 2009, and their relationship continued up until Michael's death in April of that year.

Shortly after Michael's death, Shires and Ms. Cobb became the primary suspects.  Shires was arrested for Michael's murder in May 2010.  He later confessed to the murder pursuant to a plea agreement in which he implicated Ms. Cobb.  In particular, Shires told authorities that he volunteered to kill Michael after Ms. Cobb had asked him for assistance in hiring a hitman.  Shires carried out the murder by striking Michael in the head with a baseball bat, dragging his body into a bedroom, pouring gasoline throughout the house, and setting the house on fire.  According to Shires, Ms. Cobb planned the killing, provided him with the gasoline and baseball bat, and lent him her motorcycle as a getaway vehicle.

Ms. Cobb was later arrested and charged with first degree murder in Mayes County District Court.  She pleaded not guilty and was tried before a jury in October 2011.  Shires testified against her during the trial.  In exchange for his testimony, the state agreed to the imposition of a twenty-two (22) year sentence, which Shires ultimately received.  Following a week-long trial, the jury returned a verdict of guilty.  In accordance with the jury's

recommendation, the trial court sentenced Ms. Cobb to life imprisonment without the possibility of parole.

Ms. Cobb later appealed her conviction, asserting several evidentiary and procedural errors.  The OCCA affirmed her conviction and sentence.  In doing so, it acknowledged that Ms. Cobb's trial was not error free, but determined that the few evidentiary errors that did occur were harmless.

Ms. Cobb filed a petition for a writ of habeas corpus in June 2014 and an amended petition in October 2014.  In her amended petition, Ms. Cobb reasserts claims she raised during her direct appeal.  The state acknowledges that Ms. Cobb's claims are both exhausted and timely and thus ripe for review.

## II.      STANDARD OF REVIEW

Ms. Cobb's amended petition arises under the Antiterrorism and Effective Death Penalty Act ("AEDPA").  AEDPA authorizes federal courts to entertain habeas petitions filed by state prisoners seeking relief on the ground that their "custody [is] in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  For claims adjudicated on the merits in state court, review under the statute is "highly deferential."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks omitted).  In such cases, habeas relief is available only if the state court's adjudication of the claim (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented."  *Id.* § 2254(d).  A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence.  *Id.* § 2254(e)(1).

"'Clearly established Federal law' for purposes of § 2254(d)(1) 'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" *Bonney v. Wilson*, 754 F.3d 872, 880 (10th Cir. 2014) (alterations omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  A "decision is 'contrary to' federal law 'if [it] applies a rule different from the governing . . . Supreme Court case[ law] or . . . decides a case differently than the Supreme Court has done on . . . materially indistinguishable facts." *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (alterations omitted) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A decision involves an "unreasonable application" of federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08.  "Unreasonable" in the AEDPA context means something more than incorrect; it requires an error "beyond any possibility for fairminded disagreement." *Fairchild v. Trammell*, 784 F.3d 702, 711 (10th Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  Under this test, a state-court decision is deemed unreasonable only if "all fairminded jurists would agree the . . . decision was incorrect." *Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014).

"Generally, an error of state law 'provides no basis for federal habeas relief.'" *Jones v. Stotts*, 59 F.3d 143, 145 n.2 (10th Cir. 1995) (alteration omitted) (quoting *Estelle v. McGuire*, 502 U.S. 62, 68 n. 2 (1991)).  The exception to this rule is an error "so fundamentally unfair as to deprive [the] petitioner of a fair trial and to due process of law." *Patton v. Mullin*, 425 F.3d 788, 807 (10th Cir. 2005) (quoting *Nguyen v. Reynolds*, 131 F.3d 1340, 1357 (10th Cir. 1997)); *accord Hooks*, 689 F.3d at 1180.  Such errors are rare.  "[T]he category of infractions that violate 'fundamental fairness' [is] very narrow[]," *Dowling v. United States*, 493 U.S. 342, 352 (1990), and extends only to those errors "shocking to the universal sense of justice," *United States v.*

*Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990) (quoting *United States v. Russell*, 411 U.S. 423,

432 (1973)); *accord Dowling*, 493 U.S. at 353; *Maybery v. Patton*, 579 Fed. App'x 640, 647

(10th Cir. 2014).  Because this standard "is not subject to clearly definable legal elements,"

federal courts "must approach such [an] analysis with considerable self-restraint," reversing

state-court rulings only in "the most serious cases."   *Rivera*, 900 F.2d at 1477 (internal quotation

marks omitted); *accord Harris v. Poppell*, 411 F.3d 1189, 1197 (10th Cir. 2005).

## III.    DISCUSSION

As previously stated, Ms. Cobb's amended petition asserts six grounds for relief.

Because the OCCA addressed each of her claims on the merits, AEDPA deference applies.  *See*

28 U.S.C § 2254(d).  The court addresses each claim in turn.

### A.  Sufficiency of the Evidence

Ms. Cobb first challenges the OCCA's ruling that there is sufficient evidence to support

her conviction for first degree murder.  On direct appeal, Ms. Cobb argued that Shires's

testimony against her was uncorroborated and thus should be excluded from the court's

sufficiency analysis.  Her argument was premised on an Oklahoma statute requiring that an

accomplice's testimony be independently corroborated in order to sustain a defendant's

conviction.  *See* 22 O.S. § 742;[2] *see also Pink v. State*, 104 P.3d 584, 590 (Okla. Crim. App.

2004).  The OCCA rejected the argument as follows:

> Cobb claims that the only evidence implicating her in the murder of her
> husband, Mike Cobb, was the trial testimony of her accomplice Nick Shires.  This

---

[2] Section 742 of Title 22 reads as follows:

> A conviction cannot be had upon the testimony of an accomplice unless he be
> corroborated by such other evidence as tends to connect the defendant with the
> commission of the offense, and the corroboration is not sufficient if it merely
> shows the commission of the offense or the circumstances thereof.

22 O.S. § 742.

accomplice testimony, she asserts, was not sufficiently corroborated to support her conviction.

. . . .

Nick Shires testified that at 12:30 p.m. on April 28th, 2009, Cobb picked him up in a blue Ford Escort and drove him to her house. According to Shires, after they arrived, but before Cobb's children came home from school, Cobb moved a number of items out of the house into an outbuilding. The items included children's clothing, a television, and a videocassette recorder. During the time that Cobb was moving things to the outbuilding, she gave Shires an aluminum baseball bat, told him to strike her husband with it, to make sure he was dead, and then to pour gasoline all over the house. Shires said Cobb placed three gas cans behind the back door for his use. Shires also testified that sometime earlier, he had helped Cobb remove some of her important papers and take them to his mother's house for storage.

He told the jury that he hid when Cobb's children came home from school. And, after Cobb took the children and left the house, he remained in wait until Mike Cobb returned home. When Cobb pulled up in the driveway about 8:00 p.m., Shires was waiting just inside the front door. As Cobb entered the house Shires swung at him with the bat. He missed, and Cobb ran out of the house. Shires chased him down and struck the back of his head with the bat. Cobb fell to the ground and Shires dragged him back into the house, into the master bedroom. He grabbed two of the three gas cans from near the back door, spread gasoline throughout the house and set it on fire. As they had planned, Shires escaped on Wendy Cobb's motorcycle.

State's Exhibit 1, the aluminum baseball bat found just outside the burned house, serves as material evidence corroborating Shires' testimony that Cobb gave him a metal bat to use in the murder of her husband. The evidentiary connection between this bat and Wendy Cobb was strengthened by the testimony of Cobb's friend, Beth Dobbs. Dobbs testified that Cobb called her the day after the murder frantically seeking her (Cobb's) son's baseball bat. Cobb repeatedly told Dobbs that the bat must be at Dobb's [sic] house and that she needed to get it back.

The testimony of Cobb's daughter about her polka dot Easter dress, pink cowboy boots and a Camp Rock shirt with guitars on it also provides corroboration tending to connect Cobb to her husband's murder. The girl testified she had seen these things in her house before it burned, and that, later, they had appeared at the house where Cobb and her children stayed after the fire. This evidence corroborates Shires' testimony that Cobb had moved some of her children's clothes to an outbuilding near the house. This testimony also tends to connect Cobb to the arson-murder by showing she had anticipated the destruction of her house.

Additionally, Nick Shires' stepfather testified that while Wendy Cobb and Mike Cobb were separated and in the process of divorcing, Cobb told him that she would "burn it [the house] down before she would let him [Mike Cobb] get it back" (Tr. Vol. 4 at 764). This statement, made before the arson-murder, tends to corroborate Shires' testimony that Cobb told him to burn the house after he had killed Mike Cobb.

Shires' testimony was sufficiently corroborated, and with the remaining circumstantial evidence, was sufficient to support Cobb's conviction.

[Dkt. #10-3, pp. 2–5].

In her amended petition, Ms. Cobb renews her sufficiency challenge. In particular, she contends that the OCCA's corroboration holding was premised on an unreasonable factual determination—namely, that the bat featured in State's Exhibit 1 was the murder weapon—and that without Shires's testimony the remaining evidence is insufficient to sustain her conviction.

Evidence is sufficient to support a conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In reviewing a sufficiency challenge, a court "may neither weigh conflicting evidence nor consider the credibility of witnesses." *United States v. Rodebaugh*, 798 F.3d 1281, 1296 (10th Cir. 2015) (internal quotation marks omitted). Rather, the court's role is "simply [to] determine whether the evidence, if believed, would establish each element of the crime." *United States v. Jones*, 768 F.3d 1096, 1101 (10th Cir. 2014) (quoting *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004)). Because this underlying standard is itself highly deferential, sufficiency-of-the-evidence claims "face a [particularly] high bar in federal habeas proceedings." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (noting "that *Jackson* claims . . . are subject to two layers of judicial deference" on federal habeas review).

Ms. Cobb's sufficiency challenge does not warrant federal habeas relief.  As an initial matter, no principle of federal law requires exclusion of Shires's testimony.  Assuming, as Ms. Cobb maintains, that the OCCA's corroboration analysis is premised on an unreasonable determination of the facts, any error in this regard is purely a matter of state law and is not so egregious as to constitute an independent due process violation.[3]  *See Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007); *see also Wilson v. Corcoran*, 562 U.S. 13, 16–17 (2010) (per curiam) (noting that an unreasonable state-court factual determination gives rise to federal habeas relief only if the error resulted in a violation of federal law).  With Shires's testimony included, the evidence of record is more than sufficient to support Ms. Cobb's conviction for first degree murder.  Shires testified that he killed Michael at the petitioner's request and that she provided him with the tools necessary to carry out the act.  This evidence, if believed, establishes each element of the crime charged.  *See Banks v. State*, 43 P.3d 390, 397 (Okla. Crim. App. 2002).[4]   As such, Ms. Cobb's first ground for habeas relief is denied.

### B.  Impeachment of Shires

Ms. Cobb next contends the trial court reversibly erred in limiting her ability to present impeachment evidence against Shires and that the OCCA's rulings to the contrary were objectively unreasonable.  In particular, she contends that the trial court erred by (1) ruling that the defense had failed to lay a proper foundation for presenting impeachment evidence of

---

[3] Moreover, even if State's Exhibit 1 (the aluminum baseball bat) did not in fact corroborate Shires's testimony—as appears to be the case [*see* TR 686]—the OCCA nonetheless found other evidence to corroborate his testimony.

[4] *See also* 21 O.S. § 701.7(A) ("A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being."); *id.* § 172 ("All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals.").

Shires's prior inconsistent statements, and (2) precluding defense counsel from asking Shires leading questions on direct examination.  The court addresses each argument in turn.

      1.   Prior Inconsistent Statements

The court starts with Ms. Cobb's claim regarding her counsel's effort to impeach Shires through the use of prior inconsistent statements.  At trial, during the State's case in chief, defense counsel asked Shires, "[D]id you ever tell Michelle Johnson that you killed Mike Cobb?"  [TR 712].[5]  Shires denied doing so.  The defense later called Johnson to impeach Shires on this issue. Her testimony proceeded as follows:

> **[DEFENSE COUNSEL:]**  Who was the first person that approached you— person or persons—about the subject matter of Nick Shires and this homicide case?
>
> **[JOHNSON:]**  He told me about it, what he did.
>
> . . . .
>
> **[DEFENSE COUNSEL:]**  And how did the subject matter—how did Nicholas start talking to you about this homicide?
>
> **[JOHNSON:]**  I'm not really sure on that. He—we were just talking, and, you know, he was talking about his PO and different things, and he had just mentioned—it led into that.
>
> **[DEFENSE COUNSEL:]**  Okay. And when you say "it led into that," it led into him telling you about some involvement with a homicide?
>
> **[JOHNSON:]**  Yes.
>
> **[DEFENSE COUNSEL:]**  And what did he say to you?

[TR 1102–03].  The State objected to this last question on hearsay grounds.  The court sustained the objection.  Defense counsel responded, explaining that the question was meant to illicit admissible impeachment evidence.  The following colloquy ensued:

---

[5] References to TR refer to the trial transcript, found at Docket #11.  The number immediately thereafter refers to the transcript page number in the upper right hand corner of each page.

> **[DEFENSE COUNSEL:]**  Judge, this is a co-defendant [referring to Shires].
> That is the man who's said he did not have any conversation with Michelle Marie
> Johnson about this killing.  And if it's not any—if we can't just cross-examine her
> about what Nick Shires said, we can definitely cross-examine her about what he
> said she didn't do, and that was make a statement to her.  That's what he said on
> direct.
>
> **THE COURT:**  You can talk about whether or not he made a statement to
> her, but the contents of that statement would be for the purposes of impeachment
> of Nick Shires.  And he—
>
> **[DEFENSE COUNSEL:]**  I've already asked that question and he said no.
>
> **THE COURT:**  He said he didn't talk to her.  And you can put in that he
> talked to her.  But as to what he said to her, you mustn't ask about any statements
> that he made.
>
> **[DEFENSE COUNSEL:]**  I thought I specifically asked him whether or not
> he told Michelle Johnson that he killed somebody.  That's the purpose of this
> witness being here.
>
> **THE COURT:**  Do you dispute that he asked him that?
>
> **[PROSECUTOR:]**  I do.  I don't recall him asking that.

[TR 1004–05].  After this exchange, defense counsel excused Johnson without asking any further

questions.

Ms. Cobb challenged this ruling on direct appeal.  She argued that question posed to

Johnson was meant to illicit a prior statement by Shires inconsistent with his earlier testimony

and that the trial court had erroneously denied the question for lack of foundation.  The OCCA

rejected Ms. Cobb's argument.  It determined that the trial court had made "no such ruling" and

that, even if it had, any error would be harmless because the inconsistencies at issue were

otherwise adequately presented to the jury.  [Dkt. #10-3, p. 9].

Ms. Cobb now challenges this aspect of the OCCA's decision.  In particular, she

contends that the trial court's ruling deprived her of the opportunity to effectively impeach the

State's key witness against her and that the OCCA's ruling to the contrary was objectively

unreasonable.  In response, the State maintains that the OCCA's determination that the error alleged was harmless is correct and, in any event, that it did not involve an unreasonable application of clearly established federal law.

The court agrees with the State.  The exclusion of extrinsic impeachment evidence does not violate any clearly established Supreme Court precedent.  *See Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013) (per curiam) ("[T]his Court has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." (emphasis in original)); *Murray v. Schriro*, No. CV-99-1812-PHX-DGC, 2008 WL 1701404, at *20 (D. Ariz. Apr. 10, 2008) ("[T]here is no clearly established Supreme Court precedent holding that a state violates due process by prohibiting impeachment through the use of extrinsic evidence.").  Moreover, even if it did, the record shows that defense counsel was in fact allowed to introduce evidence of Shires's prior inconsistent statement.  Shires testified that he did not tell Johnson about killing Michael.  Johnson testified to the opposite.  Because Shires denied telling Johnson *anything* about the murder, further testimony from Johnson regarding the precise details of what Shires allegedly told her about the murder would have added little, if any, additional impeachment value.  For these reasons, this claim does not warrant habeas relief.

2.  Leading Questions

Ms. Cobb next contends that the trial court committed reversible error by precluding her counsel from asking Shires leading questions on direct examination.  For its part, the OCCA agreed that the trial court had erred but determined that the error was harmless:

> Title 12 O.S.Supp.2002, § 2611(D), the evidentiary rule governing the manner and order of interrogating witnesses, provides that:
>
>> Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's testimony.  Leading questions should ordinarily be permitted on cross-examination.  **When a party calls a** hostile witness, an

adverse party, or a **witness identified with an adverse party,
leading questions may be used on direct examination**.

(Emphasis added).  In this instance, while Cobb called accomplice Nick Shires as
a witness in the presentation of her case in chief, Shires had already testified
during the State's case in chief and his testimony thoroughly incriminated Cobbs
[sic].  Shires was therefore a witness identified with the State, the adverse party.
Under the plain language of § 2611(D) then, Cobb was entitled to ask leading
questions of Shires on direct examination.  The trial judge erred.  It was an abuse
of his discretion to not allow Cobb to ask leading questions of Shires.  *See Koon
v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047, 135 L.Ed.2d 392 (1996)
("[a] district court by definition abuses its discretion when it makes an error of
law").

Nevertheless, the error of not allowing Cobb to ask leading questions does
not automatically require reversal.  An error is harmless, and therefore not a
proper basis for reversal, when a reviewing court finds beyond a reasonable doubt
that there is no reasonable probability that the error might have contributed to the
verdict.  *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L.Ed.2d
705 (1967); *Webster v. State*, 2011 OK CR 14, ¶¶ 73-74, 252 P.3d 259, 280.
Here, the thrust of Cobb's complaint is that her ability to impeach Shires was
impaired by not being able to ask him certain leading questions.

The record shows that in six of the seven instances in which the judge
disallowed leading questions, defense counsel easily reformulated the questions
into non-leading form and elicited the desired information.  These errors were
therefore harmless.  In the seventh instance, counsel chose not to reformulate the
question as he had done previously, but chose to move on to a different line of
questioning after voicing his objections to the judge during a bench conference.  It
is not obvious from the question what information defense counsel was
attempting to elicit from Shires, and not apparent from the record how Cobb's
defense was prejudiced by the judge's ruling because by the time this question
was asked, Shires had been impeached and discredited in a number of other ways.
This error was harmless.  *See Simpson v. State*, 1994 OK CR 40, ¶ 22, 876 P.2d
690, 698 (holding that reversal for objected-to evidentiary error requires showing
of prejudice); *Castro v. State*, 1992 OK CR 80, ¶ 26, 844 P.2d 159, 170 ("The
extent of cross-examination of any witness rests in the sound discretion of the trial
court.  This Court will only reverse a conviction on this issue if that discretion
was clearly abused and resulted in manifest prejudice to the defendant.").

Cobb also claims the trial judge improperly allowed the prosecutor to ask
leading questions of Shires on cross-examination when Shires testified in Cobb's
case in chief.  The crux of Cobb's argument is that the prosecutor's leading
questions "spoon-fed answers to her own witness and through him made a cogent
explanation of why his testimony should be believed despite the fact that he had
repeatedly lied, even when he was under oath" (Aplt's Brief at 16).  In essence,

Cobb complains that the prosecutor was able to unfairly rehabilitate Shires by asking leading questions.

Of the several instances Cobb identifies as improper leading questions asked by the State during its cross-examination of Nick Shires, Cobb objected to only one. Any error created by those questions not met with objection is waived and reviewed only for plan error. *Simpson*, 1994 OK CR 40, ¶ 22, 876 P.2d 690, 698-699. We review the single question that met with objection for abuse of discretion. *See Myers v. State*, 2006 OK CR 12, ¶ 40, 133 P.3d 312, 326 ("[t]he extent of cross-examination rests in the discretion of the trial court and reversal is only warranted where there is an abuse of discretion resulting in prejudice to the defendant").

Here, although Shires did testify for the State in its case against Cobb, when he was called by Cobb in her defense, it was clearly with the intent of eliciting testimony that showed he was a liar, thereby damaging the State's case and raising a reasonable doubt in the minds of the jurors. When called as a witness by the defense for this purpose, Shires became an adverse witness to the State and the prosecutor's questioning became an ordinary cross-examination. The State was therefore permitted to use leading questions. *See* 12 O.S. Supp.2002, § 2611(D), ("[l]eading questions should ordinarily be permitted on cross-examination"). The trial court judge neither committed plain error nor abused his discretion by allowing the prosecutor to ask leading questions of Shires on cross-examination during the defense case in chief.

[*Id.* at 5–9].

Ms. Cobb submits that the OCCA's ruling that this error was harmless was objectively unreasonable and, consequently, that habeas relief is warranted. In response, the State submits that the evidentiary error at issue is purely a matter of state law, thus not warranting habeas relief, and, in any event, that the OCCA's finding of harmless error is reasonable.

The court agrees with the State. The decision whether to permit or deny the use of leading questions is a matter of state evidentiary law. *See Wallace v. Lockhart*, 701 F.2d 719, 725 (8th Cir. 1983); *Thomas v. Cardwell*, 626 F.2d 1375, 1386 (9th Cir. 1980). As previously mentioned, such errors are not cognizable on federal habeas review unless so egregious as to deprive the petitioner of a fundamentally fair trial. *See Patton*, 425 F.3d at 807. That is not the case here. For the reasons stated in the OCCA's opinion, the court holds that any errors on the

trial court's part were harmless and certainly not so prejudicial as to render Ms. Cobb's trial fundamentally unfair.  Ms. Cobb's request for habeas relief on this issue is denied.

### C. Prosecutor Comments During Closing

As her next assignment of error, Ms. Cobb submits that the trial court allowed the State make an improper argument during its rebuttal at closing and that the OCCA's ruling to the contrary was objectively unreasonable.

At trial, the State introduced evidence of Ms. Cobb's cell phone records.  State's Exhibit 15 provided a log of calls and text messages sent from and received by Ms. Cobb's cell phone as recorded in the phone itself.  State's Exhibit 17 provided a list of the same information as documented by Ms. Cobb's cell phone provider, AT&T.  That exhibit disclosed calls and text messages not appearing in Exhibit 15.  Both exhibits were admitted without objection.  At closing, the prosecutor noted the discrepancy between the two exhibits and argued that it was evidence that Ms. Cobb had deleted incriminating messages from her phone:

> **[PROSECUTOR:]**  Ladies and gentlemen, let's talk about the cell phone records.  Mr. Brunton told you to look at State's Exhibit Number 15, which are the cell phone records, the records that Albert McKee got from Wendy's cell phone.  The cell phone itself.
>
> And like I said earlier, they confirm that Wendy picked Nick up at 12:34.  She says, "I'm here."
>
> It also confirms, ladies and gentlemen, that she sent Mike a text at 2:18 saying that she was going to come get the truck.
>
> Ladies and gentlemen, there's numerous texts here—text messages from the defendant to Nick and other people.  What I am concerned with, ladies and gentlemen, is the number of text messages that don't show up here.
>
> You know, we have a woman that's supposed to be very upset about losing her husband and the house being on fire, but—
>
> **[DEFENSE COUNSEL:]**  Excuse me.  If the Court please, the exhibit speaks for itself.
>
> **THE COURT:**  Overruled.  He may comment on it.

**[PROSECUTOR:]**  Ladies and gentlemen, State's Exhibit Number 17 is Wendy Cobb's entire cell phone record that I got from AT&T.  It's the complete record, not a partial record that was taken from her cell phone.

The first part of it, ladies and gentlemen, the first 16 pages, are the voice usage.  The remaining pages are the text messages.

Ladies and gentlemen, I had the opportunity to go through that record and also go through Wendy Cobb's record, and I found out many of these messages in here, in the official record, were deleted off Wendy Cobb's phone.

**[DEFENSE COUNSEL:]**  If the Court please, you know, we're talking forensic evidence here that hasn't been introduced into evidence.

**[PROSECUTOR:]**  It certainly has.

**THE COURT:**  Objection is overruled.  It's his interpretation, a fair comment.

**[PROSECUTOR:]**  For instance, ladies and gentlemen, on 4-28, the day of the homicide, at 4:10p.m., there's an incoming message from Dustin Shires to Wendy Cobb.  At 4:12 p.m., there is another incoming message from Dustin Shires to Wendy Cobb.  Those are reflected in the official report, but they're not on Wendy's cell phone.  They were deleted.

At 4:32p.m., ladies and gentlemen, there is an outgoing message from Wendy Cobb to Dustin Shires.  It too is gone.  At 4:28, at 4:56 p.m.—oh, excuse me—5:02 p.m., there's an outgoing message from Wendy to Dustin.  Not here, ladies and gentlemen.

At 5:04, there's two outgoing messages to Dustin Shires.  They're not on this phone.

At 5:05 and 5:06, there is an incoming message from Dustin Shires to Wendy and there is a call outgoing from Dustin—or from Wendy to Dustin.  They've been deleted from Wendy's phone record.

At 5:07, there is an outgoing text.  At 5—well let me—at 5:05—at 5:02, there is an outgoing from Dustin to Wendy; at 5:04, there's an outgoing from Dustin to Wendy; at 5:04, there's an incoming from Dustin to Wendy; at 5:05, there is an outgoing from Wendy to Dustin.

**[DEFENSE COUNSEL:]**  Judge, may we approach?

**THE COURT:**  Yes.

(The following transpired at the bench, out of the hearing of the jury:)

**[DEFENSE COUNSEL:]**  These numbers that he's talking about do not have any content.  How do we know that Dustin's on one end and Wendy's on the other?  The best evidence is whether it was Wendy's phone or Dustin's phone, not that Wendy did it or Dustin did it.

**THE COURT:** Characterize it as from phone to phone.

**[PROSECUTOR:]** Okay.

**[DEFENSE COUNSEL:]** Okay.

(The following transpired in open court, within the hearing of the jury:)

**[PROSECUTOR:]** All right.  Let me talk from phone to phone.

At 5:07, there's an outgoing message from Wendy's phone to Dustin's phone.  At 5:08, another one.  5:09, another one from Wendy's phone to Dustin's phone.

Ladies and gentlemen, at 9:17—April 28th, at 9:17, there is an outgoing message from Wendy's phone to Nick Shires' phone.  It's been deleted from this call log.  At 9:30—at 9:17, there's an incoming message from Nick's phone to Wendy's phone.  It's been deleted.

Ladies and gentlemen, why would they delete these phone calls?

9:17, we know that is immediately after the homicide.  Wendy and Nick are communicating, but they're erasing any record of it.  They don't want anyone to know what they're talking about.

At 9:20—at 9:36, Johnny Cobb calls.  At 9:36, there is an outgoing message to Nick Shires from Wendy's phone.  At 9:36, there is an incoming call to Wendy's phone, from Nick Shires.  And at 9:38, there is a—well, strike that.

Ladies and gentlemen, at 9:57, there's another incoming call from Nick's phone to Wendy's phone.  At 9—at 10:02, there is an outgoing message from Wendy's phone to Nick's phone.

At 10:07, there's an incoming message from Nick's phone to Wendy's phone.  At 10:12, there is an incoming message from Nick's phone to Wendy's phone.  At 10:19, there is—well, strike that.  At 10:30, there is an outgoing message from Wendy's phone to Nick's phone.

And, ladies and gentlemen, every one of those phone calls, every one of those text messages had been deleted from Wendy's phone.

Wendy's involvement with Nick Shires in the homicide of Mike Cobb, ladies and gentlemen, the evidence is there.  What do you think they're texting about and deleting?

You know, Mr. Brunton said there's nothing in here that indicates any wrongdoing.  Of course not.  It's been deleted.  All those phone calls were deleted.  We don't know what they said.  And the reason we don't know what they said is because Wendy Cobb deleted them.

**[DEFENSE COUNSEL:]** Judge, again, I'm going to— there's no evidence of that.  This is a forensic report we're talking about here.  And I'd—I'd move all of that argument be stricken.  There is no evidence that that's been deleted.  That takes a forensic person to tell us that.

> **THE COURT:**  Ladies and gentlemen—objection is overruled.
> Ladies and gentlemen, you will remember the evidence as you heard it.
> Remember, what Mr. Ramsey says is not evidence.
> Proceed, Mr. Ramsey.

[TR 1176–81].

Ms. Cobb challenged the trial court's rulings on this issue on direct appeal.  She argued

that the prosecutor's comments during closing exceeded the bounds of proper argument and

lacked support in the record.  The OCCA rejected the claim:

> "Parties have wide latitude, in closing argument, to discuss the evidence
> and reasonable inferences from evidence, and relief is required only where grossly
> improper and unwarranted argument affects a defendant's rights."  *Hogan. v.
> State*, 2006 OK CR 19, ¶ 91, 139 P.3d 907, 936.  A reasonable inference in the
> context of a prosecutor's argument need only be one that is possible and has some
> logical connection to the point being argued.  *See Commonwealth v. Dinkins*, 615
> N.E.2d 570, 575 (Mass. 1993) ("[t]he inferences suggested by the prosecutor need
> only be reasonable and possible and need not be necessary or inescapable");
> *United States v. Waldemer*, 50 F.3d 1379, 1384 (7th Cir. 1995) ("The term
> 'reasonable inference' must be defined contextually.  Whether the evidence bears
> logical and proximate connection to the point the prosecutor wishes to prove are
> perhaps the most obvious considerations in determining whether the inference is
> reasonable.").

> Here, it is very possible that the calls and messages listed on the AT&T
> invoice, but not found on the list of calls and messages derived from Cobb's
> phone, were the result of intentional deletion by Cobb.  Of course it is also
> possible, as Cobb suggests, that the AT&T invoice was in error and listed calls
> not made or received by Cobb, but that possibility does not negate intentional
> deletion as a valid possibility.  Because the inference urged upon the jury was a
> possible inference that could be drawn from State's Exhibits 15 and 17, the
> prosecutor's statement urging jurors to draw an inference of intentional deletion
> was a reasonable inference from the evidence.  The prosecutor's statement was
> not improper argument.

[Dkt. #10-3, pp. 11–12].

Ms. Cobb again raises this issue as a point of error in her habeas petition.  Her arguments

are mostly a reiteration of those she asserted before the OCCA.  In response, the State submits

that the OCCA's decision was a reasonable application of the relevant Supreme Court case law and that, as such, the writ should not issue.

"Prosecutorial misconduct does not warrant federal habeas relief unless the conduct complained of 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Duvall v. Reynolds*, 139 F.3d 768, 794 (10th Cir. 1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Comments offering fair inferences from the evidence presented do not violate due process. *See United States v. Lopez-Medina*, 596 F.3d 716, 740 (10th Cir. 2010); *Thornburg v. Mullin*, 422 F.3d 1113, 1131 (10th Cir. 2005). Moreover, a "prosecutor is allowed a reasonable amount of latitude in drawing inferences from the evidence during closing summation." *United States v. Manriquez Arbizo,* 833 F.2d 244, 247 (10th Cir.1987). "Inquiry into the fundamental fairness of a trial can be made only after examining the entire proceedings." *Boyd v. Ward*, 179 F.3d 904, 920 (10th Cir. 1999).

After reviewing the proceedings and the evidence presented, the court agrees with the OCCA's holding. The evidence presented shows a disparity between the message and call logs on Ms. Cobb's phone and those in AT&T's records. In particular, the evidence shows that several calls and text messages documented in AT&T's records were missing from Ms. Cobb's phone. A reasonable inference from this disparity is that Ms. Cobb deleted the calls and text messages at issue. The OCCA's holding to this effect was reasonable and does not warrant habeas relief. As such, Ms. Cobb's third ground for habeas relief is denied.

### D.  Trial Court's Instruction to Disregard Hearsay Evidence

As her fourth ground for habeas relief, Ms. Cobb challenges the OCCA's ruling that the trial court adequately instructed the jury to disregard certain hearsay evidence. At trial, Donny Jordan, a friend and business partner of Michael, testified about a telephone call he received

from the Cobbs' son, Corbin.  According to Jordan, it quickly became apparent that Corbin had

mistakenly placed the call and was unware that he had done so.  Jordon testified that he listened

to the call for approximately forty (40) minutes and, during that time, overheard a conversation

between Corbin, Ms. Cobb, and Corbin's girlfriend.  When asked about the substance of that

conversation, the following exchange ensued:

> **[PROSECUTOR:]**  And what was the sum and substance of that
> conversation, sir?  What could you get from it as a kind of fourth-party listener?
>
> **[JORDAN:]**  What I could understand is they were looking for something in
> the shop.
>
> **[PROSECUTOR:]**  Okay.
>
> **[JORDAN:]**  They were going through the boxes.  They said they needed to
> really find this.  They never specified exactly what it was they were looking for.
> And I heard Corbin's girlfriend said, "Well, the cops can't come back out
> here unless they have a warrant."
> And I heard Wendy say, "We have to find it."
>
> **[DEFENSE COUNSEL:]**  Judge, this is hearsay.
>
> **[JORDAN:]**  I don't know what it was.
>
> **[DEFENSE COUNSEL:]**  This is hearsay.
>
> **[PROSECUTOR:]**  No, it's not.
>
> **[JORDAN:]**  I heard that.
>
> **THE COURT:**  Okay.  The objection is sustained.  The jury will disregard
> all of the—all of the testimony about the phone call as it relates to anyone except
> Wendy Cobb.

[TR 914–15].  Defense counsel did not object to the phrasing of the trial court's instruction.

At closing, the prosecutor summarized Jordan's testimony as follows:  "Donny Jordan

overhears a conversation between Wendy, Wendy's son Corbin, and his girlfriend, where they're

frantically searching for an object that they must find before the police come back." [TR 1148].

Defense counsel did not object to the argument.

On direct appeal, Ms. Cobb argued that the trial court's instruction regarding Jordan's testimony was unclear and did not cure the error raised.  In particular, she argued that the instruction did not explicitly direct the jury to disregard all statements of other persons quoted by Jordan except Cobb.  The OCCA rejected the argument:

> Cobb did not object to the instruction, nor did she request a differently worded instruction.  The claim is therefore waived and reviewed only for plain error.
> In this instance, while the trial judge's admonition to the jury could have been more clearly stated, it nevertheless told jurors not to consider Jordan's testimony about the phone call except with regard to Wendy Cobb.  A common sense understanding of this instruction in light of the testimony jurors had just heard would be that the Court was directing them to consider only the statements attributed to Cobb.  This admonishment adequately covered the subject.  Its use, therefore, was not error.  Hence, there is no plain error.

[Dkt. #10-3, pp. 15–16 (citations omitted)].

In her amended petition, Ms. Cobb contends that the OCCA's decision on this issue was objectively unreasonable and that any curative effect the instruction may have had was eliminated by the prosecutor's restatement of Jordan's testimony during closing.  In response, the State submits that the error alleged concerns a matter of state law not cognizable on federal habeas review and, in any event, that the OCCA's holding was objectively reasonable.

The court agrees with the State.  The admission of nontestimonial hearsay is a matter of state law and thus cannot support federal habeas relief unless the evidence was so unfairly prejudicial as to deprive the petitioner of a fair trial.[6]  *See Brown v. Epps*, 686 F.3d 281, 286 n.20 (5th Cir. 2012); *see also Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Where

---

[6]  Although it is doubtful that any statements by Corbin or his girlfriend were offered to prove the truth of the matter asserted, the court accepts the OCCA's implicit conclusion that such statements were hearsay.

nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ."). Here, the testimony at issue was clearly nontestimonial, *see Michigan v. Bryant*, 562 U.S. 344, 358 (2011) (holding that a statement is nontestimonial if it was "not procured with a primary purpose of creating an out-of-court substitute for trial testimony"); *see also Crawford*, 541 U.S. at 51–53 (providing examples of testimonial statements), and was not so prejudicial as to render Ms. Cobb's trial fundamentally unfair. Because this alleged error does not violate federal law, any shortcoming in the trial court's curative instruction does not warrant federal habeas relief. Moreover, on the substance, the court agrees with the OCCA that the instruction provided adequately cured any potential error. For this reason, Ms. Cobb's fourth ground for habeas relief is denied.

### E.  Improper Bolstering of Witness Testimony

Ms. Cobb next contends that the trial court improperly allowed the prosecution to bolster Shires's testimony through the use of prior consistent statements and that the OCCA's holding that this error did not warrant reversal was objectively unreasonable. At trial, after the defense attempted to impeach Shires's credibility, the State introduced several statements from Shires's preliminary hearing testimony in an effort to refute the defense's allegations of bias and fabrication. Defense counsel did not object to the evidence. On appeal, Ms. Cobb argued that Shires's prior testimony did not fall within the hearsay exception for prior consistent statements and thus was improperly admitted in violation of 12 O.S. § 2801. Reviewing for plain error, the OCCA agreed that the evidence had been improperly admitted but concluded that the error did not warrant reversal:

> Under plain error review, it is the appellant's burden to show: (1) the existence of an actual error (i.e., deviation from a legal rule); (2) that the error is plain or obvious; (3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding. Even if these elements are met, this

Court will correct plain error only if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice.

For its part, the State does not argue that there was no error in the prosecution's use of prior consistent statements to rehabilitate Shires. The State does contend, however, that any such error was harmless because the prior consistent statements were merely cumulative to evidence already presented by the State and the defense.

Title 12 O.S.Supp. 2002 § 2801(B)(1)(b) allows a prior consistent statement into evidence as non-hearsay if the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive and was made before the supposed fabrication, influence, or motive arose." Here, as Cobb argues, Shires' prior consistent statements from the preliminary hearing were made after he entered into a plea agreement with the State for a reduced sentence in exchange for his testimony against Cobb. Thus, the preliminary hearing statements were not made before the supposed fabrication or motive to fabricate arose. Under § 2801(B)(1)(b), Shires' prior consistent statements from his preliminary hearing testimony were inadmissible hearsay.

Nevertheless, despite the error, under plain error review, Cobb must show a violation of a substantial right. That is, she must show that the error affected the outcome of the proceeding. Cobb contends that because the outcome of the case depended in large part on the jurors' assessment of Shires' truthfulness when he said Wendy Cobb asked him to kill her husband, the presentation of the prior consistent statements bolstered Shires' testimony and led the jury to believe him and return a guilty verdict. In other words, Cobb argues that had jurors not heard Shires' prior preliminary hearing statements, statements that were merely consistent with his trial testimony, they likely would have returned a not guilty verdict. This is unlikely.

Under questioning by defense counsel, the jury was made keenly aware that Shires had a motive to lie (he had been offered a shorter sentence in exchange for his testimony against Cobb). The jury was also aware, based on a jury instruction regarding accomplice testimony, that Shires' credibility was suspect. It is doubtful, therefore, that this jury would have returned a not guilty verdict, if they had not heard excerpts of his preliminary hearing transcript, testimony consistent with his trial testimony. Shires' preliminary hearing testimony was consistent with his trial testimony; it was simply cumulative to that testimony, and likely would not have affected the outcome of the trial. Consequently, although the error is plain or obvious, reversal is not warranted.

22

[Dkt. #10-3, pp. 18–20 (alteration omitted) (citations omitted) (internal quotation marks omitted)].

Ms. Cobb challenges the OCCA's ruling in her amended petition.  In particular, she argues that the evidence "added weight to [Shires's] testimony . . . and greatly affected the outcome of the verdict."  [Dkt. #8, p. 25].  In response, the State submits that the error alleged concerns a matter of state law not cognizable on federal habeas review and, in any event, that the OCCA's holding was objectively reasonable.

The court agrees with the State.  "[W]hen [a] declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his [or her] prior testimonial statements."  *Crawford*, 541 U.S. at 59 n.9 (citing *California v. Green*, 399 U.S. 149, 162 (1970)).  In that situation, the admission of such statements is purely a matter of state law and thus cannot support federal habeas relief unless the evidence was so unfairly prejudicial as to constitute an independent due process violation.  *See Patton*, 425 F.3d at 807.  For the reasons stated in the OCCA's opinion, the court agrees that any state-law errors on the trial court's part were harmless and certainly not so prejudicial as to render Ms. Cobb's trial fundamentally unfair.  Ms. Cobb's request for habeas relief on this issue is denied.[7]

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11 of the *Rules Governing Section 2254 Cases in the United States District Courts* instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a

---

[7] Because Ms. Cobb has not shown that the OCCA's decision involved any federal constitutional errors, the court need not address her final claim of cumulative error.  *See Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013) ("In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors . . . ." (quoting *Matthews v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009)); *United States v. Battles*, 745 F.3d 436, 462 (10th Cir. 2014) (noting that a cumulative error claim requires "the existence of multiple non-reversible errors" (quoting *United States v. Lopez-Medina*, 596 F.3d 716, 741 (10th Cir. 2010)).

final order adverse to the applicant."  The court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicate[s] which specific issue or issues satisfy [that] showing."  28 U.S.C. § 2253(c). This standard demands that the issues raised are debatable among reasonable jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

After considering the record in this case, the court concludes a certificate of appealability should not issue.  Nothing suggests this court's application of AEDPA standards to the OCCA's decision is debatable amongst reasonable jurists or deserving of further proceedings.  A certificate of appealability shall be denied.

WHEREFORE, Ms. Cobb's Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus [Dkt. #8] is denied.  A certificate of appealability is denied.

IT IS SO ORDERED this 17th day of August, 2016.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT